UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT L. DYKES,

        Plaintiff,

v.

UNKNOWN BENSON, *et al.*,

        Defendants.

_____/

Case No. 1:18-cv-664

Hon. Paul L. Maloney

# REPORT AND RECOMMENDATION

      This is a civil rights action brought by *pro se* plaintiff Robert L. Dykes ("Dykes") pursuant to 42 U.S.C § 1983. Dykes is a prisoner in the custody of the Michigan Department of Corrections (MDOC). The alleged incidents occurred at the Oaks Correctional Facility (ECF) in 2017 and 2018. Five defendants remain in this action: Corrections Officer (CO) Krista Benson, Classification Director Amy Haske, CO Brent Davis, CO James Thompson, and Prison Counselor (PC) Patrick Miseta.[1]

      Dykes has four claims remaining against these defendants:

      1. CO Benson retaliated against plaintiff regarding his prison work assignment (plaintiff would never receive his correct pay, plaintiff would never receive a position higher than general porter, and plaintiff might lose his current work assignment).

      2. Classification Director Haske failed to secure plaintiff proper pay.

---

[1] Plaintiff refers to defendant Miseta as an assistant resident unit supervisor (ARUS). Compl. (ECF No. 1, PageID.5). In his affidavit, Miseta refers to himself as a prison counselor ("PC"). Patrick Miseta Aff. (ECF No. 69-7, PageID.647). The Court will use this designation.

1

3. CO Davis, CO Thompson, and PC Miseta were deliberately indifferent to plaintiff's health and safety when they forced him into the intolerable segregation cell.

4. CO Thompson and PC Miseta denied plaintiff's request for cleaning equipment.

*See* Amended Case Management Order (ECF No. 66, PageID.697).

This matter is now before the Court on defendants' motion for summary judgment with respect to these remaining claims (ECF No. 68).

    **I.**    **Motion for summary judgment**

    **A.**    **Legal standard for summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for

summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Defendant Benson retaliated against Dykes

Dykes seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*,

3

175 F.3d 378, 394 (6th Cir. 1999).

A prisoner must be able to prove that the exercise of the protected right was the substantial and motivating factor in the defendant's alleged retaliatory conduct.

> As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim.

*Nieves v. Bartlett*, -- U.S. --, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks and brackets omitted).

The Court previously summarized Dykes' claim against CO Benson as follows:

> Plaintiff was working as a general porter on October 21, 2017, when he raised the issue of his pay with Defendant Benson. (Compl., ECF No. 1, PageID.16.) The role of general porter is apparently not a semi-skilled or skilled position that might warrant the additional pay. Plaintiff reports that Defendant Benson told Plaintiff he would never receive his correct pay, he would never receive a position higher than general porter, and that he may not even hold that position for long. (*Id*.) Benson told him that she would talk with Defendant Haske to "make sure." (*Id*.) Plaintiff describes Benson's conduct as an egregious abuse of authority. He filed a grievance against her that day for harassment. (Grievance ECF 2017-10-3533-17A, ECF No. 1-1, PageID.35-44.)

Opinion (ECF No. 17, PageID.278).

The Court previously summarized Dykes' related claims against Classification Director Haske as follows:

> Although Plaintiff's problems with Defendant Benson ended, he was not able to resolve the pay rate issue with Defendant Haske. He contacted Defendant Haske on November 19, 2017, and November 28, 2017, at the suggestion of Corrections Officer Lee, for the purpose of securing the proper pay rate. When Plaintiff did not receive a response, he filed a grievance against Defendant Haske on November 28, 2017. (Grievance ECF-2017-12-3986-02C, ECF No. 1-1, PageID.68-71.)

> Plaintiff's grievance was resolved at the first step. His certificate was verified by Defendant Haske, he was given a floor porter position, and his pay was increased to $1.08 per day. (*Id.*, PageID.71.) There were no floor porter positions in Plaintiff's housing unit, so he was put to work on the segregation floor. (*Id.*) Plaintiff did not want to work on the segregation floor because the conditions and cleaning requirements were unpleasant. He filed a grievance against Defendant Haske for giving him that assignment. (Grievance ECF-2017-12-4067-27Z, ECF No. 1-1, PageID.72-76.) The grievance was rejected.

*Id*. at PageID.279-280.

As an initial matter, at page 7 of his complaint, Dykes declared "under the penalty of perjury 28 U.S.C. 1746 that the foregoing is true and correct." Compl. at PageID.7. "A verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment." *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Dykes also signed two "declarations" pursuant to § 1746 which he attached to his motion to proceed *in forma pauperis* (ECF Nos. 2 and 3). These are not related to his allegations. Dykes also signed a third "declaration" in support of his complaint (ECF No. 4, PageID.202-205), and a fourth "declaration" declaring that the declarations of three other prisoners were written by the prisoners of their "own will" and given to Dykes (ECF No. 5). The third declaration is relevant to the complaint.

CO Benson acknowledged that she had a conversation with Dykes on October 21, 2017, at which time Dykes complained about his pay rate. Krista Benson Aff. (ECF No. 69-2, PageID.631).[2] During this conversation, Benson informed Dykes that she could not change his pay rate and that he would need to kite the classification director, defendant Haske. *Id*. Benson also stated that "I at no time had anything to do with Dykes' pay as I was not the officer that was

---

[2] Defendants' counsel has incorrectly entitled the declarations of defendants Benson, Haske, Davis, Miseta, and Thompson as "affidavits" rather than "declarations." *See* Order (ECF No. _**XX**_).

conducting the payroll in the unit during this time," and that "[u]nder my job duties, I was not able to change prisoner's pay, nor change their job assignments." *Id*. Benson further stated that "[a]t no time did Classification Director Haske and me have any conversations in reference to Dykes' job or pay rate." *Id*. at PageID.632.

In his declaration opposing the motion for summary judgment, Dykes states that Benson was the supervisor who conducted "payroll management" in 6-Block and that "Benson did the payroll." Dykes' Declaration (ECF No. 72-1, PageID.675). As discussed, Benson stated that she did not conduct the unit payroll during the relevant time period. However, assuming that Benson "did the payroll" as Dykes claims, Benson set forth evidence in her affidavit that she was not able to change Dykes' job or his pay rate. As discussed, *infra*, Classification Director Haske had that authority and exercised it.

Based on this record, there is no evidence that defendant Benson was a "decisionmaker" with respect to Dykes' prison work assignment or his pay rate. "The motivations of non-decisionmakers cannot establish a causal connection in a retaliation case. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir.2001); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir.1999)." *Echlin v. Boland,* 111 Fed. Appx. 415, 417 (6th Cir. 2004). Dykes cannot show a causal connection to establish a retaliation claim against Benson. Accordingly, defendant Benson should be granted summary judgment on this claim.

### C.    Defendant Haske failed to secure Dykes proper pay[3]

---

[3] Defendants appear to address this issue as involving both a retaliation claim under federal law and a claim that defendant Haske violated an MDOC policy regarding prisoner work assignments under state law. As discussed in a previous court order (ECF No. 62, PageID.596) and the amended case management order (ECF No. 66, PageID.607), there is no retaliation claim remaining against defendant Haske.

On December 3, 2017, plaintiff filed a grievance which stated: that he was told to contact defendant Haske about receiving a higher pay rate based on his Custodial Maintenance Certificate (*i.e.*, a Custodial Maintenance Technology Certificate or "CMT"); that he attempted to contact her on November 19, 2017, and November 28, 2017; and that he did not receive a response from Haske. *See* Grievance ECF 2017-12-3986-02C (ECF No. 1-1, PageID.69-71). Plaintiff's grievance was resolved at Step I on December 6, 2017. *Id*. The Step I response summary states as follows:

> Prisoner's CMT has been verified by CD Haske. His detail has been changed and his rate of pay for November payroll to $1.08 per day. Since HU 6 does not have any vacant floor porter positions to place Dykes in, he has been changed from 6 blk general porter to 5 blk floor porter. This goes into effect on 12/7/17. I find no violation of PD 05.01.100. The issue has been resolved.

PageID.71. Plaintiff agreed that the matter was resolved on December 6, 2017, and signed off on the grievance. PageID.70.

The record reflects that based on Dykes' qualifications, he was moved from a general porter job (unskilled) with a pay rate of $0.74 per hour to a floor porter job (semi-skilled) with a pay rate of $1.08 per hour. Amy Haske Aff. (ECF No. 69-3, PageID.635). When Dykes' CMT was verified, he was paid in accordance with MDOC Policy Directive 05.02.110 and the Program Classification Manual. *Id*. Although Dykes actually worked an unskilled job until December 7, 2017, MDOC personnel gave him the benefit of the CMT and applied the higher semi-skilled pay rate of $1.08 retroactively to his November 2017 payroll. *Id*.

Defendants point out that Dykes' Trust Account Statement reflects the pay increase:

> Dykes' Trust Account Statement verifies that he was paid at a rate of $1.08 starting in November 2017. [Defs. Ex. C., Trust Account.] The Trust Account shows that Dykes was given a November 2017 payroll deposit of $16.20 for 15 days worked ($1.08 X 15 = $16.20). *Id*. Dykes was given a December 2017 payroll

7

>  deposit of $18.36 for 17 days worked ($1.08 X 17 = $18.36).  *Id*. And Dykes was given a January 2018 payroll deposit of $14.04 for 13 days worked ($1.08 X 13 = $14.04). *Id*.

Defendants' Brief at PageID.68-69.  This being said, defendants did not provide copies of the actual payroll records which set forth the actual days that Dykes worked.  Rather, defendants divided Dykes' total payroll by the pay rate of $1.08 to reach the hours worked.

In his declaration opposing the motion for summary judgment, Dykes stated that he was paid at a lower rate of $0.74 per day, and that he worked 22 days in November 2017, 25 days in December 2017, and 20 days in January 2018.  Dykes Decl.  Using these work days, Dykes stated that he was paid: $16.20 for 22 days in November 2017; $18.36 for 25 days in December; and, $14.04 for 20 days in January.

Dykes' declaration does not rebut defendants' evidence. Contrary to his declaration, Dykes could not have worked 20 days in January 2018.  It is undisputed that plaintiff was placed in segregation from January 17, 2018, through February 13, 2018.  Lock History (ECF No. 69-5, PageID.642).  Even if Dykes worked every holiday, week day, and weekend before being placed in segregation, he would have worked at most 17 days, not 20 days.

In addition, Dykes supports his calculations with an exhibit identified as ECF No. 5.  Dykes Decl. at PageID.675. The cited document is a Court order granting *in forma pauperis* which does not address Dykes' calculations or payroll records.

Furthermore, while Dykes appears to have relied on a prisoner Trust Account Statement (ECF No. 2-1, PageID.196-197), this is the same record relied upon by defendants (ECF No. 69-4) and it does not support his calculations. Notably, the payroll receipts set out in the prison records are not multiples of $0.74 per day as Dykes claims.  If Dykes was paid $0.74 per day for

8

22 days in November, he would have been paid $16.28, not $16.20. If Dykes was paid $0.74 per day for 25 days in December, he would have been paid $18.50, not $18.36. Finally, if Dykes was paid $0.74 per day for 20 days in January (an amount of time he could not have worked), Dykes would have been paid $14.80, not $14.04. *See* PageID.196-197. In short, Dykes' declaration appears to be a crude attempt to reverse engineer his payroll to establish a pay rate of $0.74 per day. In this regard, Dykes went so far as to include incorrect equations in his response: "0.74 x 22 = $16.20"; "0.74 x 25 - $18.36"; and "0.74 x 20 = $14.04." Response at PageID.665; Declaration at PageID.675.

Finally, Dykes' entire argument is inconsistent with this third declaration, in which he states, "I was incorrectly paid 0.77 a day from Oct. 2017 thru Jan. 2018." Dykes' Decl. (ECF No. 4, PageID.202).

In reviewing Dykes' prison trust account statement, the Court notes that neither Dykes nor defendants addressed a second payroll receipt for January 12, 2018 for "December payroll" in the amount of $4.32. PageID.196-197, 639. Using the parties' method of "divide the payroll by the pay rate of either $0.74 per day or $1.08 per day" approach, this unidentified payroll receipt established a pay rate of $1.08 for four days of work.

The record reflects that Classification Director Haske corrected the error with respect to Dykes' prison work assignment and that Dykes received payment at the rate of $1.08 per day. There is no evidence to support Dykes' claim that Haske failed to secure him proper pay. One purpose of the prison grievance system is to resolve this type of dispute. *See Jones v. Bock*, 549 U.S. 199, 204 (2007) ("Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court."). Notably,

9

the matter was resolved to Dykes' satisfaction when he signed off on the grievance. Accordingly, defendant Haske should be granted summary judgment on this claim.[4]

> **D. Defendants Davis, Miseta and Thompson violated Dykes' Eighth Amendment rights by forcing him into an intolerable segregation cell, and defendants Thompson and Miseta denied Dykes' request for cleaning equipment**
>
> **1. Legal standard**

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir.1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."

---

[4] Defendants also contend that the resolution of Grievance 3986 bars Dykes' retaliation claim because he received appropriate pay and cannot establish any adverse action against him. *See* Defendants' Brief at PageID.622. Defendants have not adequately briefed the issue. While defendants declare that there was no adverse action, they do not address whether the favorable resolution of a grievance negates the adverse action requirement of a retaliation claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotation marks omitted). In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to inmate health or safety." *Mingus v. Butler*, 591 F.3d 474, 479 80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834 (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

It is well recognized that exposure to unsanitary conditions may violate the Eighth Amendment's prohibition on subjecting inmates to an excessive risk of harm. *See Rhodes*, 452 U.S. at 347 (recognizing that minimal sanitation is required by the Eighth Amendment). Allegations about temporary inconveniences do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *See Dellis v. Corrections Corporation of America*, 257 F.3d 508, 511 (6th Cir. 2001) (holding that placement in a flooded cell without a working toilet failed to establish a constitutional violation); *Hartsfield v. Vidor*, 199 F.3d 305, 310 (6th Cir.1999) (stating that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment"); *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (a prisoner's exposure for three days to a filthy cell with "blood on the walls and excretion on the floors" was not cruel and unusual punishment). Nevertheless, an extended inconvenience may implicate the Eighth Amendment. As the Supreme Court observed in *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978), "the length of confinement cannot be ignored. . . . A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months."

### 2. Dykes' allegations against defendants Davis, Thompson and Miseta

The Court previously summarized plaintiff's Eighth Amendment claims against defendants Davis, Thompson, and Miseta as follows:

> [On January 17, 2018] Defendant Davis placed Plaintiff in an observation cell used for mentally ill prisoners. Neither the light nor the toilet worked. The cell reeked of feces and urine. Plaintiff complained. Davis told Plaintiff to raise the issue with Defendant Miseta. When Miseta turned on the light, Plaintiff could see the walls were coated with feces and other unknown substances. Plaintiff asked Davis for cleaning supplies. Davis told Plaintiff he would have to wait until Saturday.

Opinion at PageID.281.

> On January 18, Plaintiff asked Defendant Miseta to move Plaintiff and for cleaning supplies. Defendant Miseta would not move Plaintiff and told him cleaning supplies would be available on Saturday, January 20. Plaintiff requested cleaning supplies from Defendant Thompson as well. Defendant Thompson told Plaintiff he would receive cleaning supplies on January 20.

*Id.* at PageID.281-282.

> On January 20, Plaintiff asked Defendant Thompson for proper "bloodborne" protective gear to clean the feces off the walls. Defendant Thompson refused. Plaintiff was compelled to return the equipment he was provided, a sponge and toilet brush, after a short period of use. He was then forced to clean with a sock and water. Thompson told Plaintiff to raise the issue with Miseta.

*Id.* at PageID.282.

### 3. Condition of the segregation cell

Dykes was transferred to segregation cell 126 in Housing Unit IV on January 17, 2018. Lock History (ECF No. 69-5, PageID.642). In his third declaration, Dykes stated that,

> On Jan. 17, 2018, at approximately 7:00 p.m., after being strip searched by defendant Davis, he placed me in cell 126 (4-Block). Immediately the ferocious smell of feces and urine hit me, instantly I gagged. I tried to cut the light on and flush the toilet, but the switches didn't work. When Davis made his round I informed him of the horrible smell, and asked if I could be moved, he said I have to submit a kite to defendant Miseta for a cell move. I then informed him about

> the light and cell workings, and he cut the light on and flushed the toilet by the controls outside the cell. That's when I seen feces and unknown substances on the walls. And the inside of the toilet corrosion. When Davis made another round I showed him the feces on the walls and the badly corroded inside of the toilet, and told him about the smell. When I asked him for some cleaning supplies, he stated "clean up is on Saturdays only."

Dykes' Decl. (ECF No. 4, PageID.204). Dykes stated that defendants refused to provide him with cleaning supplies and that he suffered these conditions for 27 days. *Id*. at PageID.205.

In his affidavit, defendant CO Davis stated that Dykes' allegation that the cell "was unclean and had feces spread on the wall and smelled like urine" are false. Brent Davis Aff. (ECF No. 69-6, PageID.645). Defendant PC Miseta stated that Dykes' allegation that "the cell he was assigned to on January 18, 2018 (Housing Unit IV, Observation Cell 126) was unclean and had feces spread on the walls and smelled like urine" are false. Patrick Miseta Aff. (ECF No. 69-7, PageID.648). Defendant CO Thompson also stated that Dykes' allegation that "on January 18, 2018, his cell (Housing Unit IV, Observation Cell 126) was unclean and had feces spread on the wall and smelled like urine" are false. James Thompson Aff. (ECF No. 69-8, PageID.652). In addition, all three defendants stated that if they were alerted to the alleged conditions, it would be investigated, and if true, the prisoner would be removed from the cell and the cell would be thoroughly cleaned. Davis Aff. at PageID.645, Miseta Aff. at PageID.648, and Thompson Aff. at PageID.652. These statements regarding defendants' normal procedure in dealing with a dirty cell do not establish that Dykes was placed in a clean cell. Accordingly, there is an issue of fact as to the condition of Dykes' cell on January 17 and 18, 2018.

    **4.**     **Denial of cleaning supplies**

13

In his third declaration, Dykes stated that "[a]s asserted in my complaint defendants Thompson and Miseta denied me cleaning supplies after I showed them the conditions of the cell." Dykes' Decl. (ECF No. 4, PageID.204).

### a.  **Defendant Miseta**

Dykes alleged that on January 18, he asked defendant Miseta to provide cleaning supplies. Miseta's affidavit does not address Dykes' claim directly. In his affidavit, Miseta stated that "Prisoner Dykes was never forced to stay in an unsanitary cell," and explained the procedure for obtaining cleaning supplies,

> Dykes also alleges that on January 18, 2018, that I denied him cleaning supplies. In Housing Unit IV, there were designated days in which prisoners were given supplies to clean their own cells. Dykes was given cleaning supplies on these days if he requested them   On top of this, if there was some particular need for cleaning supplies outside of the normal cleaning days, prisoners would be provided supplies if the situation warranted it.

Miseta Aff. at PageID.648.

In addressing Dykes' claims against Miseta, defendants point out that one of the 45 exhibits attached to Dykes' complaint is a kite which he labels "Request for cell move." *See* Kite (ECF No. 1-1, PageID.146). Defendants assert that this kite was manufactured by Dykes for use in this lawsuit.  In this kite, directed to defendant Miseta, Dykes stated as follows:

> I would like to submit a cell move request: This cell has feces on the walls, the toilet has an offensive, foul smell of urine and feces, and I am being denied cleaning supplies.   Plus, theres [sic] a camera in here, I'm being watched to use the bathroom, and when I get naked to take a bird bath, its very humiliating, and morally wrong.

Kite (March 18, 2018) (ECF No. 1-1, PageID.147).

While Dykes submitted this kite to support his claims against defendant Miseta, the kite is dated March 18, 2018 (two months after the incident) and identifies his Lock as 2-128 (the

14

cell he was assigned in general population in March 2018, not the segregation cell (Lock 126) which is the basis of this lawsuit). *Id*. In addition, Dykes inexplicably cites 28 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury") after his signature on the kite. *Id*. Dykes' response does not address defendants' assertion that he manufactured this evidence to establish a claim against defendant Miseta. Based on this record, Dykes' claims against defendant Miseta arise from a kite manufactured for this lawsuit. A jury cannot reasonably find for a plaintiff based on false evidence which was manufactured to support allegations in a lawsuit. For this reason, defendant Miseta should be granted summary judgment with respect to Dykes' Eighth Amendment claims.

        **b.**    **Defendant Thompson**

In his affidavit, defendant Thompson denied as untrue Dykes' allegation "that on January 18, 2018, I denied him needed cleaning supplies." Thompson Aff. at PageID.652. Thompson did not address Dykes' claim with any specificity. Rather, Thompson set out the procedure for distributing cleaning supplies to a prisoner:

> Once a week, all prisoners are given, sponges, disinfectant, toilet brushes, brooms and mops so that they can clean their own cell. On top of this, if there was some particular need for cleaning supplies outside of the normal cleaning days, prisoners would be provided supplies if the situation warranted it.

*Id*.

Thompson also addressed Dykes' claim that he denied Dykes "proper" cleaning supplies on January 20, 2018 (the Saturday set aside for cleaning), stating that:

> On this day, Dykes was given a sponge, disinfectant, toilet brush, broom and mop. At no time was Dykes forced to use "sox and water" to clean his cell.

*Id*.

15

Dykes does not contradict that Thompson provided him with cleaning supplies on January 20, 2018; rather, Dykes wanted special cleaning equipment for "blood borne" pathogens:

> On January 20, 2018, during clean up, I asked defendant Thompson if I could get the proper blood bourne [sic] protective gear (latex gloves, fluid impervious gown, face mask, face shield, and shoe covers) to clean the feces off the walls, Thompson stated "not only are you not getting the blood bourne [sic] equipment, but you'll be on clean up restriction if you don't return that sponge and toilet brush in 5 min.") [sic]   When I pointed to the fecess [sic] in the several areas, he stated, "How many times your [sic] going to keep pointing to that shit, talk to ARUS Miseta."   I was not given any cleaning solution and was forced to use a sox [sic] and water to try and clean the feces, because I couldn't take it no more.

Compl. at PageID.13.

### 5. Summary of the Eighth Amendment claims

For purposes of this motion, the Court accepts as true Dykes' claim that he was placed in a filthy cell on January 17, 2018, and that he spent three days in the cell before receiving cleaning supplies. However, it is undisputed that Dykes had cleaning supplies on January 20, 2018. Assuming that Dykes was placed in a filthy cell without cleaning supplies for two days, this was a temporary inconvenience which does not establish a federal constitutional violation.  *See Dellis*, 257 F.3d at 511; *Hartsfield*, 199 F.3d at 310; *Davis*, 157 F.3d at 1006.   Accordingly, defendants Davis, Thompson, and Miseta should be granted summary judgment with respect to Dykes' Eighth Amendment claims.

### II. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 68) be **GRANTED** as to all remaining claims.

Dated:  January 3, 2022                                          /s/ Ray Kent
                                                                 United States Magistrate Judge

16

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).